## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

GOLDEN POLAR BEAR, LLC,
THOMAS CALLEN, and
COURTNEY CALLEN,

      Plaintiffs,

    v.

FRANCHOICE, INC., and
PETER GILFILLAN,

      Defendants.

Case No. 19-cv-484 (MJD/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendants' Motion for Partial Dismissal

Pursuant to Rule 12(b)(6).  (Dkt. 25.)  This case has been referred to the undersigned

United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C.

§ 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that

Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) be granted in part

and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed the Complaint in this action on February 27, 2019.  (Dkt. 1.)

Defendants subsequently moved to dismiss the Complaint.  (Dkt. 15.)  That motion was

withdrawn after Plaintiffs filed an Amended Complaint.  (Dkt. 23.)

The operative Amended Complaint alleges as follows: Plaintiffs Courtney Callen

and Thomas Callen, who reside in and are citizens of Colorado, own Plaintiff Golden

Polar Bear, LLC, a limited lability company formed under the laws of Colorado with a

principal place of business in Colorado Springs, Colorado, where it owns and operates an ILoveKickBoxing franchise.  (Dkt. 22 ¶¶ 3-5.)  The Callens became interested in purchasing a franchise in October 2015.  (*Id.* ¶ 12.)  In October 2015, Plaintiffs engaged Defendants Franchoice, Inc. ("FCI") and, in turn, the FCI consultant and representative Peter Gilfillan ("Gilfillan"), to assist them in finding appropriate franchise opportunities. (*Id.*)  FCI is a corporation formed under the laws of Minnesota, with its principal place of business in Eden Prairie, Minnesota.  (*Id.* ¶ 6.)  It is a franchise broker that assists prospective franchisees in identifying, investigating, selecting, and acquiring franchises. (*Id.*)  Gilfillan, an FCI representative, is an individual residing in Naperville, Illinois and is a citizen of Illinois.  (*Id.* ¶ 7.)

Through its website (https://www.franchoice.com/), FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and represented that it would match "entrepreneurs like you with the perfect franchise business."  (*Id.* ¶ 13.)  FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected . . . as franchise businesses matching [his] requirements."  (*Id.*) FCI further represented that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you." (*Id.*)

In an October 20, 2015 email, Gilfillan represented to the Callens that "we have PRE-SCREENED literally hundreds of franchise companies to find the ones that are A+ Opportunities.  We take the model and use it to sort through these to see if any of the A+

2

companies might match up well for you." (*Id.* ¶ 14.) Gilfillan also provided Plaintiffs a document entitled "Franchise Company Investigation Procedure" that stated that the Franchise Disclosure Document disclosed the history of the franchise and its officers and directors, all costs and fees that the franchisee would be subject to, any relevant litigation history of the company or its officers, and "any business failures, ownership transfers, franchise agreement terminations or other potentially adverse information relating to the success rate of the existing units in the system." (*Id.*)

Gilfillan held himself out to the Callens as an expert in the franchise industry. (*Id.* ¶ 15.) Following their initial contact with Gilfillan, Plaintiffs provided personal information to Defendants for the purposes of matching them with an appropriate franchise opportunity. (*Id.* ¶ 16.) In a November 4, 2015 phone call, FCI and Gilfillan introduced the Callens to ILoveKickBoxing. (*Id.* ¶ 17.) Non-party ILKB, LLC ("ILKB") is the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness. (*Id.* ¶ 8.) At all relevant times, ILKB was a New York limited liability company with its headquarters in New York State. (*Id.*) ILKB offered and sold franchises only in and from New York State. (*Id.*) The Callens were interested in establishing a location in Colorado Springs, Colorado, and ultimately three locations in Colorado Springs became available for purchase by the Callens. (*Id.* ¶ 17.)

Prior to the purchase of a ILKB franchise, FCI and Gilfillan made the following representations or omissions concerning the financial performance of the franchise: Gilfillan confirmed to Plaintiffs that the business was a semi to fully absentee owner

business, meaning that Plaintiffs would need to devote only a few hours a week to supervising a manager; Gilfillan represented that there had been zero location closings and that "no one is struggling with this franchise"; Gilfillan represented that the high-end for investment in an ILKB franchise was $300,000; Gilfillan represented that ILKB was extremely successful at marketing the franchise and driving leads to the franchise; Gilfillan that ILKB would handle 100% of the marketing activities; Gilfillan represented that as a result of ILKB's marketing abilities, 33% of ILKB locations had six-week long waiting lists at various times during the year; and no mention was made of any membership attrition issues or issues with customer debts in the form of delinquents, declines and cancellations. (*Id.* ¶¶ 22-24.)

In reliance on the representations of FCI, including by Gilfillan, that FCI had done its due diligence on ILKB and were experts in the franchise industry, and relying on the representations made by Gilfillan, the Callens attended a Discovery Day at ILKB headquarters in Merrick, New York from February 15-17, 2016 for the purposes of familiarizing themselves with ILKB as a franchisor. (*Id.* ¶ 18.) The Callens signed a multi-outlet agreement to purchase up to three ILKB franchise locations on February 29, 2016. (*Id.* ¶ 19.)

In reliance upon the representations of FCI, including Gilfillan, that FCI had done its due diligence on ILKB and were experts in the franchise industry, and in reliance upon Defendants' superior knowledge, Plaintiffs invested $110,000 in franchise fees and $254,280.84 in outfitting the Colorado Springs location, as well as undertook loan and lease obligations. (*Id.* ¶¶ 20, 25.)

After opening the business, Plaintiffs learned that the representations that FCI and Gilfillan had made to them relating to ILKB franchises were untrue, including their discovery that: the costs associated with setting up a studio were higher than previously represented; it was not possible to operate the franchise as an absentee owner; ILKB's marketing was not effective enough to make the franchise profitable and failed to drive sufficient customers to the studio; it was not possible to open additional locations with the profits of one or two locations; and ILKB's marketing was not effective enough to make the franchise profitable. (*Id.* ¶ 26). In addition, FCI never disclosed that attrition made it impossible to attain or maintain the levels of membership needed to "break even." (*Id.* ¶ 26(d).) Plaintiffs were unable to maintain income from existing members because of member attrition and failures to pay, and the franchisor's undisclosed policy of not enforcing, or permitting enforcement of, member contracts and payment obligations. (*Id.*)

Defendants also failed to do or disclose their due diligence by not discovering or communicating to Plaintiffs the existence of lawsuits and a bankruptcy related to ILKB's founder and its affiliates, and that ILKB had been fined by the Minnesota Department of Commerce for unlawfully selling franchises in Minnesota. (*Id.* ¶¶ 28-29.) Plaintiffs assert that had they known of this information they would not have purchased any franchises from ILKB. (*Id.* ¶ 29.) FCI's conduct was the result of the fact that ILKB paid it huge commissions on the sale of each franchise. (*Id.* ¶ 31.) "FCI was pleased to continue selling ILKB franchises and to take this money until sometime in 2018 when it became aware of franchisee claims against it, at which point it hastily ceased representing

ILKB." (*Id.*)

Plaintiffs assert claims for relief against Defendants for their alleged violations of the New York Franchise Sales Act, N.Y. Gen. Bus. L. 680 *et seq.* and the Colorado Consumer Protection Act. Plaintiffs also assert claims against Defendants for common law fraud, negligent misrepresentation, and fraud by omission.

Defendants move to dismiss Plaintiffs' New York Franchise Sales Act ("NYFSA") and Colorado Consumer Protection Act ("CCPA") claims.

## II.    <u>LEGAL STANDARD</u>

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In addition, a court must afford the plaintiff all reasonable inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the United States Supreme Court in *Iqbal* and *Twombly*.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations

omitted). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

> Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:

> While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n. 3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). While matters "outside the pleadings" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Thus, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned, without converting the motion into one for summary judgment. *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

## III.    <u>ANALYSIS</u>

### A.    **Plaintiffs' Claim Under the New York Franchise Sales Act**

According to Plaintiffs, FCI and Gilfillan violated the NYFSA by making false representations and omissions to the Callens for the purpose of inducing them to purchase an ILKB franchise. (Dkt. 22 ¶ 36.) Defendants argue that the NYFSA claim fails as a matter of law because they are not franchisors, and because they did not offer or sell any franchise to Plaintiffs, given that it was non-party ILKB who offered and sold the franchise at issue and the Amended Complaint does not allege that Defendants offered or sold a franchise to Plaintiffs on behalf of ILKB. (Dkt. 27 at 6-8.)

Under New York law, "[t]he primary consideration of the courts in the construction of statutes is to ascertain and give effect to the intention of the Legislature." N.Y. Stat. Law § 92. When the language of a statute is plain, courts are required to follow its mandates. *See Kimmel v. State*, 29 N.Y.3d 386, 392, 80 N.E.3d 370, 373 (2017) (concluding that courts under New York law should look "first to the plain language of the statute[ ] as the best evidence of legislative intent") (quotation marks and citation omitted); *Better World Real Estate Grp. v. New York City Dep't of Fin.*, 122 A.D.3d 27, 35, 992 N.Y.S.2d 247 (2014) (citations omitted) ("[C]ourts should construe clear and unambiguous statutory language as to give effect to the plain meaning of the words used."). The NYFSA was enacted specifically to prevent, combat, and protect the franchisee from rampant franchise sales fraud, it is remedial in nature, and therefore, is to be liberally construed. *See A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 162 Misc. 2d 941, 951, 618 N.Y.S.2d 155, 161 (Sup. Ct. 1994), *aff'd*, 214 A.D.2d 473, 625 N.Y.S.2d 904 (1995), *aff'd as modified*, 87 N.Y.2d 574, 663 N.E.2d 890 (1996) (citations omitted). In that interpretative context, courts are obliged to "'harmonize the various provisions' of a statute to achieve its legislative purpose." *Id.* (citations omitted).

The NYFSA provides that the following conduct is unlawful:

2. It is unlawful **for a person, in connection with** the **offer, sale or purchase of any franchise**, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. It is an

9

affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

N.Y. Gen. Bus. Law § 687(2) (emphases added). "A **person who offers or sells** a franchise in violation of . . . [§ 687] is liable to the person purchasing the franchise for damages and, if such violation as willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs." N.Y. Gen. Bus. Law § 691(1) (emphasis added).

## 1.      Whether Defendants Are "Persons" Under the NYFSA

While Defendants' arguments turn on the argument that it was ILKB as the franchisor who offered and sold the franchises at issue, that argument ignores the plain meaning of the NYFSA of who can be held liable under the Act.  Even assuming that ILKB is the franchisor, liability under the NYFSA is not limited to franchisors; rather it extends broadly to "person[s]," which is defined under the NYFSA as follows:

> "Person" means an individual, corporation, partnership, joint venture, association, company, trust, unincorporated organization or other entity and shall include any other person that has a substantial interest in or effectively controls such person, as well as the individual officers, directors, general partners, trustees or other individuals in control of the activities of each such person.

N.Y. Gen. Bus. Law § 681(13).  Indeed, Defendants, notwithstanding their contention that they did not offer to sell or in fact sell a franchise as required for liability under the NYFSA, do not contest that they are persons for the purposes of § 681(13).

10

2.    **Whether Defendants' Alleged Conduct Amounts to an "Offer" or an "Offer to Sell" Under the NYFSA.**

Plaintiffs argue that Defendants' conduct amounts to a solicitation to them to buy an ILKB franchise.  (Dkt. 30 at 6-9.)  Defendants' assertion that no liability can attach to them under the NYFSA because there are no allegations in the Amended Complaint that they sold or offered to sell an ILKB franchise to Plaintiffs relies on an overly narrow construction of the term "offer" under the NYFSA.  The NYFSA defines "offer" as follows:

> "Offer" or "offer to sell" includes **any attempt to offer to dispose of, or solicitation of an offer to buy, a franchise or interest in a franchise for value**.  The terms "offer" and "offer to sell" do not include the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee.

N.Y. Gen. Bus. Law § 681(11) (emphases added).

The word "solicitation" is not defined within the NYFSA.  Under New York law, courts "are to construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as 'useful guideposts' in determining the meaning of a word or phrase."  *Rosner v. Metro. Prop. & Liab. Ins. Co.*, 96 N.Y.2d 475, 479-80, 729 N.Y.S.2d 658, 660 (2001) (citation omitted).  The plain meaning of the word "solicitation" is found in the dictionary; it in relevant part, means the "act or an instance of requesting or seeking to obtain something" or "[a]n attempt or effort to gain business."  *Solicitation, Black's Law Dictionary* (11th ed. 2019); *see generally, Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) ("'Solicitation,' commonly understood, means 'asking' for, or 'enticing' to, something[.]") (citing *Black's Law Dictionary* (6th ed. 1990)).

Here, the Amended Complaint alleges that FCI held itself out as directing prospective franchisees to high quality franchise businesses, and Gilfillan represented that "we have PRE-SCREENED literally hundreds of franchise companies to find the ones that are A+ Opportunities" (Dkt. 22 ¶¶ 12, 14); and introduced the Callens to ILKB over the phone (*id.* ¶ 17). Moreover, Defendants allegedly made numerous representations regarding favorable reasons why Plaintiffs should purchase an ILKB franchise (*id.* ¶¶ 19, 22-24) and were paid "huge commissions" by ILKB for the sale of the franchises to Plaintiffs (*id.* ¶ 31). Given the NYFSA's broad language under § 687(2) prohibiting fraud "**in connection with** the offer, sale or purchase of any franchise" and the statute's broad remedial purpose, the Court finds that Plaintiffs have plausibly alleged that FCI solicited from Plaintiffs an offer to buy an ILKB franchise, as evidenced by Defendants' alleged representations set forth above, made to entice an offer from Plaintiffs for an ILKB franchise. While Defendants argue that none of these solicitations amounted to an offer and that there are no allegations of Defendants making a solicitation (Dkt. 27 at 7; Dkt. 32 at 2, 6-7), this argument ignores the fact that the definition of an "offer" includes solicitation by Defendants of an offer from Plaintiffs to purchase a franchise, which is adequately alleged in the Amended Complaint as evidenced by the alleged numerous positive statements made by Defendants as a whole regarding ILKB so that they could ultimately receive a commission from ILKB for the sale. *See Reed v. Oakley*, 172 Misc. 2d 655, 658, 661 N.Y.S.2d 757, 759 (Sup. Ct. 1996), *aff'd*, 240 A.D.2d 991, 659 N.Y.S.2d 820 (1997) ("The conduct covered by the definition is not limited to the act of signing on the dotted line after the solicitation is made. Here, the

solicitation and other negotiations were made prior to approval, and, by definition, amounted to an offer to sell prior to approval.").  Simply put, Plaintiffs have adequately alleged for purposes of the NYFSA that Defendants' communications, taken together, were seeking to obtain and entice from Plaintiffs an offer to purchase an ILKB franchise.

Again, Defendants' arguments focus on the fact that the Amended Complaint does not allege that they are in the business of selling franchises or that they sold a franchise in this case.  (Dkt. 27 at 7; Dkt. 32 at 2, 6.)  However, the NYFSA separately defines "franchisor" as "a person who grants a franchise."  N.Y. Gen. Bus. Law § 681(5).  Had the New York Legislature only meant for liability to attach to franchisors, they simply could have defined a "Person" as a Franchisor consistent with § 681(5).  Instead, as set forth above, they defined it expansively.  Moreover, while the Court agrees that there is no dispute that the ultimate transaction involving the sale of the franchise was between ILKB and Plaintiffs, the word "solicit" does not confine itself to a franchisor and the ultimate act of the offer and acceptance, especially here where it is alleged that Defendants had a financial incentive to convince Plaintiffs to purchase an ILKB franchise.  *See generally*, *Reed*, 172 Misc. 2d at 658 ("The conduct covered by the definition is not limited to the act of signing on the dotted line after the solicitation is made."); *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)[1] (finding with respect to the Securities

---

[1]    The Supreme Court went on to explain that:

[B]rokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors.  Thus, solicitation is the stage at which an investor

Act that "[u]nder these definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12.").

Defendants argue for the first time in their reply that the remedies section of the NYFSA makes it clear that the NYFSA applies to franchisors, not Defendants. (Dkt. 32 at 10.) Courts generally do not consider substantive matters that are raised for the first time in a reply memorandum. *See* LR 7.1(c)(3)(B); *see also Unison Co. v. Juhl Energy Dev., Inc.,* No. CV 13-3342 ADM/BRT, 2018 WL 4426204, at *4 (D. Minn. Sept. 17, 2018) (citations omitted). Not only does the Court reject this argument on this procedural basis, it also rejects the argument on its merits. The remedies provision of the NYFSA provides:

> A person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred eighty-seven of this article **is liable to the person purchasing the franchise <u>for damages and</u>, if such violation as willful and material, for <u>rescission</u>**, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs.

N.Y. Gen. Bus. Law § 691(1) (emphases added). Defendants argue that the language of

---

is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.

*Id.* at 646-47. This is similar to the scenario alleged here, where "brokers" (Dkt. 22 ¶ 11) such as FCI are poised to control the information disseminated to prospective franchisees and it is at this solicitation stage where prospective franchisees are likely to be persuaded to purchase an ILKB franchise, especially where FCI and its agents are allegedly acting as an independent source of information and are ultimately receiving a benefit from a sale in the form of a commission from ILKB (*id.* ¶ 21).

Section 691 undercuts Plaintiffs' arguments that they can be held liable under the NYFSA because the remedy of rescission within this provision can only be granted through ILKB, the franchisor.  (Dkt. 32 at 10.)

The fact that the remedies under the NYFSA include rescission along with damages as possible remedies does not mean that the NYFSA can only apply to franchisors or that a person cannot seek one remedy without seeking the other.  Such an interpretation is contrary to the clear language of the statute.  By way of example, there is no dispute that an employee of a "person" as defined under the NYFSA can be held liable under the NYFSA.  *See* N.Y. Gen. Bus. Law § 691(3) (employees can be held liable to the same extent as an employer).  However, under Defendants' argument, such an employee could not be held liable because obviously the employee, even if they are an employee of a franchisor, does not have the ability to effect a rescission.  Simply put, Defendants' interpretation would rewrite the definition of "person" under the act to only mean a franchisor.  Given the expansive scope as to what includes a "person" and "offer" under the plain language of the NYFSA, the fact that the statute was "enacted specifically to prevent, combat and protect the franchisee from rampant franchise sales fraud," *A.J. Temple Marble & Tile, Inc.*, 162 Misc. 2d at 951, and the need to harmonize the various provisions of the NYFSA to effectuate this purpose, *id.*, the Court finds that the intent of the New York Legislature was not only to punish franchisors but to ensure that brokers, such as FCI and their agents, are held accountable for the resulting harm to franchisees from their alleged fraudulent statements that franchisees acted in reliance on when deciding to purchase a franchise, even if the ultimate purchase is from a different party.

15

### 3.   Whether the Sale or Offer to Sell Occurred in New York.

Defendants also argue that dismissal of the NYFSA claim here is necessary under General Business Law § 683 because there are no allegations that Defendants or Plaintiffs have connections with New York or that any of the interactions between Plaintiffs and Defendants occurred in New York.  (Dkt. 27 at 9-10.)  Plaintiffs counter that the NYFSA applies in this case because FCI and Gilfillan solicited Plaintiffs to purchase an ILoveKickBoxing franchise from ILKB, and ILKB accepted Plaintiffs' offer to buy in New York.  (Dkt. 30 at 13-14.)

"The New York Franchise Sales Act [ ], GBL §§ 680-695, governs franchise transactions, but only when the sale or offer to sell occurs in New York."  *EV Scarsdale Corp. v. Engel & Voelkers N. E. LLC*, 48 Misc. 3d 1019, 1028 (N.Y. Sup. Ct. 2015) (citing *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 70 F. Supp. 3d 376, 393 (D.D.C. 2014), citing *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616-17 (S.D.N.Y. 2011) ("[T]he NYFSA is applicable only to specific transactions solicited or accepted in New York, or affecting New York."), quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *5 (S.D.N.Y. 2004)); *see generally,* N.Y. Gen. Bus. Law § 681(12)[2] (defining for the purposes of necessary disclosures under § 683 when an offer is made in New York).

---

[2]   Section 681(12) provides:

(a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.

In this case, the Amended Complaint alleges that ILKB offered and sold franchises only in and from New York State.  (Dkt. 22 ¶ 8.)  Given that the communications at issue allegedly induced Plaintiffs to ultimately make an offer to purchase a franchise in New York, Plaintiffs' claim is governed by the NYFSA.

### 4.    Whether Plaintiffs' Claims Are Time-Barred

Defendants also argue for the first time in the Reply that Plaintiffs' NYFSA claim is time barred.  (Dkt. 32 at 3-6.)  Defendants claim that it "is clear from these attachments that the NYFSA claim is barred."  (*Id.* at 3.)  Defendants refer to the Franchise Agreement and the Multi-Outlet Agreement, which were not attached to the Amended Complaint, but Defendants submitted in opposition to this Motion, in support of this argument.  (*Id.*)  Defendants' assertion based on these documents is inconsistent with their execution argument, made later in the Reply, where they assert that the claims are time barred because Plaintiffs alleged in their Amended Complaint that they signed the

---

(b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed.  An offer to sell is accepted in this state when acceptance is communicated to the offeror from this state.

(c) An offer to sell is not made in this state merely because a publisher circulates or there is circulated on his behalf in this state a bona fide newspaper or other publication of general, regular and paid circulation which has had more than two-thirds of its circulation outside this state during the past twelve months, or a radio or television program originating outside this state is received in this state.

N.Y. Gen. Bus. Law § 681(12).

agreement on February 29, 2016.[3] (*Id.* at 4 (citing Dkt. 22 ¶¶ 19, 22-24).) Indeed, Defendants do not rely on any particular portion of the documents as part of their substantive argument, just the allegation in the Amended Complaint regarding the date of Plaintiffs' signature of the agreements. In other words, Defendants' statute of limitation argument, which is based on allegations in the Amended Complaint and not the documents, was available to them when they initially moved to dismiss, and should have been raised in Defendants' opening brief. Because Plaintiffs have not been given an appropriate opportunity to respond to this argument, the motion to dismiss on statute of limitations grounds should be denied in this basis alone. *See* LR 7.1(c)(3)(B); *see also Unison Co.*, 2018 WL 4426204, at *4.

The Court also finds this argument is not appropriate for decision on the present motion to dismiss. "A federal court sitting in diversity applies the statute-of-limitations rules of the forum." *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) (citation omitted). Minnesota Statutes Section 541.31, subdivision (a)(1), applying to conflicts of law as it relates to statutes of limitations, provides, "if a claim is substantively based upon the law of one other state, the limitation period of that state applies. . . ." Minn. Stat. § 541.31(a)(1). Given that the substantive law of New York applies to the claim at issue, the Court will apply the statute of limitations as set forth in the NYFSA.

---

[3] Plaintiffs filed their initial Complaint in this action on February 27, 2019 (*see* Dkt. 1); served the Summons and Complaint on FCI on March 27, 2019 (Dkt. 10); and served the Summons and Complaint on Gilfillan on March 30, 2019 (Dkt. 11).

Under the NYFSA:

> An action shall not be maintained to enforce a liability created under this section unless brought before the expiration of **three years after the act or transaction constituting the violation**.

N.Y. Gen. Bus. Law § 691(4) (emphasis added). For the purposes of determining when the statute of limitations begins to run on a NYFSA claim, "the 'act or transaction constituting the violation occurred when the franchises were purchased.'" *Kroshnyi v. U.S. Pack Courier Serv's, Inc.*, 771 F.3d 93, 103 (2d Cir. 2014); *see also Chan v. Big Geyser, Inc.*, No. 1:17-CV-06473 (ALC), 2018 WL 4168967, at *14 (S.D.N.Y. Aug. 30, 2018) (same).

In reaching its holding, the Second Circuit in *Kroshnyi* surveyed the available case law on this issue:

> *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 407 (S.D.N.Y. 2001) ("United Magazine"), *aff'd*, 279 Fed. Appx. 14, 19 (2d Cir. 2008) (holding that "the limitations period begins to run at the time that the parties first enter into the franchise agreement"); *Leung v. Lotus Ride, Inc.*, 198 A.D.2d 155, 604 N.Y.S.2d 65, 67 (1st Dep't 1993) (FSA claims based on "franchise agreements that were executed more than three years prior to commencement of the action" properly dismissed as untimely); *see also Bayit Care Corp. v. Tender Loving Care Health Care Servs. of Nassau Suffolk, LLC,* 843 F. Supp. 2d 381, 385 (E.D.N.Y. 2012) ("In assessing the timeliness of claims made under the FSA, courts have generally determined that the three-year limitations period begins to run when the franchise contract is entered into, and that continuous violations do not toll the statute of limitations.") (internal quotation marks omitted).

*Kroshnyi*, 771 F.3d at 103.

Defendants maintain that what is important for the purposes of the NYFSA is when the franchise agreement was executed by the franchisee. (Dkt. 32 at 4.) However, New York law s*upra,* requires that courts look at when the parties, and not just the

franchisee, entered into the agreement.  The Amended Complaint is devoid of any

mention of when ILKB signed the Agreement or the date of purchase, and Defendants

offer no argument that the agreements, even assuming that they are embraced by the

Amended Complaint, set forth definitely for the purposes of a motion to dismiss when

ILKB entered into the agreement.[4]  *See Joyce v. Teasdale*, 635 F.3d 364, 367 (8th Cir.

2011) ("As a general rule, the possible existence of a statute of limitations defense is not

ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the

defense.") (quotation marks and citations omitted).  As such, a dismissal based on this

undeveloped statute of limitations argument is not appropriate.[5]

### 5.    Conclusion

For all of the reasons set forth above, Plaintiffs have adequately alleged a plausible

claim against Defendants under the NYFSA and the Motion to Dismiss this claim should

be denied.

---

[4]     The Court notes that the ILKB's signature is undated and the Franchise
Agreement provides that "[t]his Agreement **will become effective only upon the
execution by you and by us**, and only after you were provided with a FDD.
HOWEVER, THIS AGREEMENT **IS NOT BINDING ON US UNLESS AND UNTIL
IT HAS BEEN ACCEPTED AND SIGNED BY OUR PRESIDENT**."  (Dkt. 30-2 at
37 of 49 (emphases added).)  As far as this Court can tell, it was Scott Ferrari, the
Director of Franchise Development, and not the President of ILKB, who signed the
agreements.  (Dkt. 30-2 at 39 of 50; Dkt. 30-3 at 12 of 13.)

[5]     Given that it is unclear when ILKB executed the agreements or the purchase was
otherwise effectuated, the Court will not address whether filing of the Complaint or
service marks the commencement of the action.  Nothing in the Report and
Recommendation should be interpreted as precluding Defendants from bringing a Motion
for Summary Judgment once they obtain competent evidence in support of their statute of
limitations affirmative defense.

**B.    Plaintiffs' Claim Under the Colorado Consumer Protection Act, C.R.S. § 6–1–101 et seq.**

The CCPA was "enacted to regulate commercial activities and practices, which because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (quotation marks and citations omitted).  In this regard, "CCPA deters and punishes businesses which commit deceptive practices in their dealings with the public . . . ." *Id.*  Specifically, the CCPA works to deter and punish businesses for consumer fraud.  *Id.*  The CCPA should be liberally construed to serve its broad purpose and scope. *See Hall v. Walter*, 969 P.2d 224, 230 (Colo. 1998).

In order to prevail in a private cause of action under the CCPA, a plaintiff must prove the following elements: "(1) the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered the injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury."  *Rhino Linings*, 62 P.3d at 146-47; *see also Obduskey v. Fargo*, No. 15-CV-01734-RBJ, 2016 WL 4091174, at *3 (D. Colo. July 19, 2016), *aff'd sub nom. Obduskey v. Wells Fargo*, 879 F.3d 1216 (10th Cir. 2018) (finding that in order to state a CCPA claim, a plaintiff must allege the all of the elements) (citation omitted).

Defendants argue that Plaintiffs have not adequately pled the necessary "significant public impact" to support a CCPA claim.  (Dkt. 27 at 11-14.)  Indeed, "[t]he CCPA cannot be used to remedy a purely private wrong."  *Crowe v. Tull*, 126 P.3d 196,

208 (Colo. 2006). As such, the CCPA requires Plaintiffs to show that Defendants'
"challenged practice **significantly impacts** the public as actual or potential consumers of
the defendant's goods, services, or property." *See Rhino Linings,* 62 P.3d at 149 (citation
omitted) (emphasis added). The relevant considerations that a court should consider in
determining whether a challenged practice significantly impacts the public includes:

> (1) the number of consumers directly affected by the challenged practice, (2)
> the relative sophistication and bargaining power of the consumers affected
> by the challenged practice, and (3) evidence that the challenged practice has
> previously impacted other consumers or has the significant potential to do so
> in the future.

*Id.* (citation omitted).

"To adequately make this allegation, plaintiffs' complaint must meet the low
burden of setting forth facts that, if proved, could establish a public impact 'upon any
theory of the law.'" *Gen. Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*, 230 P.3d
1275, 1279 (Colo. Ct. App. 2010) (quoting *Rosenthal v. Dean Witter Reynolds, Inc.,* 908
P.2d 1095, 1100 (Colo. 1995), quoting *Hinsey v. Jones*, 159 Colo. 326, 329, 411 P.2d
242, 244 (1966)).

The allegations in the Amended Complaint relating to the alleged significant
public impact in this case are as follows:

> Defendants' fraudulent misrepresentations to the Callens were part of an
> overall program and practice to broker the sale of franchises to the public
> through false representations.

> Defendants in fact have brokered the sale of dozens of franchises to the
> public pursuant to false representations, and willful omissions of material
> facts.

> As a result of Defendants' violations of the Colorado Act, substantial
> numbers of innocent people, including Plaintiffs, have lost their life savings

and incurred substantial debt.  Unless Defendants' fraudulent and unlawful practices are ceased, the public will continue to be injured by their continuing wrongs.

(Dkt. 22 ¶¶ 53-55.)

The alleged fraudulent misrepresentations made by Defendants in this case relate only to ILKB franchises.  Nowhere in Amended Complaint is it alleged that the fraudulent representations at issue were made to the public at large or to even a large portion of the population.  The allegations are that Plaintiffs engaged Defendants to assist them in finding appropriate franchise opportunities and the representations occurred as part of that engagement between the parties.  (Dkt. 22 ¶¶ 12, 14, 17, 22-24, 26, 29.) Indeed, the specific alleged misrepresentations at issue are not alleged to have been made by Defendants to the public via the internet or other mass media, but rather to Plaintiffs directly (*id.* ¶¶ 22-24, 26).  *Compare Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998) (no significant public impact when alleged deceptive practices occurred only in the context of private agreement to provide services), *with Tull*, 126 P.3d at 209 (misleading lawyer advertising could support CCPA claim where it "potentially affects a large swath of the public via television, print media, radio, and the internet").

The only specific allegations asserted in the Amended Complaint related to the representations made to others dealt with following alleged omissions:

> In addition, FCI perpetrated the same fraud, selling ILKB franchises to many unsuspecting franchisees, inducing them to place their trust in it, promising that it would provide them with the information that they needed in order to make an informed decision, and then either failing to advise them that Parrella had been in bankruptcy and that Parrella, ILKB and ILKB's affiliates had been sued – and at that time were being sued – for fraud and violation of franchise laws.

(Dkt. 22 ¶ 30.)

Again, Plaintiffs do not assert that the alleged omissions were made to a large subsection of the public, let alone the Colorado public, just those who may have purchased an ILKB franchise. *See NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1137 (D. Colo. 2007) (finding no significant public impact since "[t]he misrepresentations at issue here—that a specific person was interested in buying insurance, when in fact he or she was not—were given in individual transactions to insurance companies, rather than being "directed to the market generally"). In other words, Plaintiffs have not plausibly alleged that the specific "challenged practice" as it relates to the representations that they relied upon "significantly impacts the public." *Rhino Linings*, 62 P.3d at 149.

Plaintiffs assert that Defendants' fraudulent conduct here was part of an overall program and practice that satisfies the public harm requirement based on the fact that FCI's website represents that it brokered the sale of 20,000 franchises. (Dkt. 30 at 17.) However, Colorado courts have rejected this type of argument, finding that "under the CCPA, it is not enough that the defendant's industry affects the public interest. Adopting an interpretation that the public impact element of the CCPA could be satisfied simply if the defendant's industry 'affects the public interest' would render this requirement and our discussion of the public impact considerations in *Rhino Linings* meaningless." *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155-56 (Colo. 2007).

Consistent with the Colorado Supreme Court's rationale that "the fact that a workers' compensation insurer and an insured have a dispute over a claim does not necessarily mean that other members of the public are or have been affected by the

insurer's practices," this Court also finds that even if FCI has brokered the sale of 20,000 franchises, offers its services to the public, and advertises itself as an expert (Dkt. 30 at 14 (citing Dkt. 22 ¶¶ 11, 13, 15)), that does not mean that other members of the public, including those in Colorado, have been or are in danger of being affected by Defendants' alleged challenged practices relating to ILKB, especially in light of the Amended Complaint's assertion that Defendants ceased representing ILKB in 2018.  (Dkt. 22 ¶ 31.) Plaintiffs ask this Court to presume that there are many others who have suffered as the result of some type of fraud by Defendants, which is insufficient for the purposes of pleading a significant public impact.  *See Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1174 (10th Cir. 2008) ("'Merely presuming' that 'additional clients of PLI were left with a gap in coverage after the repeal of the No-Fault Act without being advised and provided the option of excess UM/UIM coverage, as the Sewells do, is insufficient.'").

Also cutting against the plausibility that this impact is of the public-related type required by Colorado law for a CCPA claim is the cost of a franchise.  As alleged in the Amended Complaint, Plaintiffs invested $110,000 in franchise fees for three franchises and $254,280.84 in outfitting the Colorado Springs location, as well as undertook loan and lease obligations.  (Dkt. 22 ¶¶ 20, 25.)  Plaintiffs cannot in good faith assert that a large swath of the general public can afford hundreds of thousands of dollars, or even the approximately over $30,000 price tag for a franchise, needed to operate an ILKB franchise.  *See Curragh Queensland Mining Ltd. v. Dresser Industries, Inc*., 55 P.3d 235, 241 (Colo. Ct. App. 2002) (no public impact was found where the defendant's advertising went to "about 3,000 mining companies," but as with PFI's screening process, "only a

very few" could afford the equipment advertised).

Plaintiffs argue that this Court can take judicial notice of the fact that there are thirteen other cases before it that involve Defendants.  (Dkt. 30 at 17.)  Courts in Colorado have limited CCPA claims to conduct occurring within Colorado and affecting Colorado consumers.  *See Loughridge v. Goodyear Tire and Rubber Co.*, 192 F. Supp. 2d 1175, 1185-86 (D. Colo. 2002) (to determine whether significant public impact existed, the court focused on the impact on Colorado consumers).  The fact that are at least thirteen cases involving FCI before the Court (and at least two other cases in Minnesota State District Courts) is insufficient to support a CCPA claim, especially where there is no continued threat from FCI as it relates to ILKB,[6] these are all cases dealing with ILKB, as opposed to other franchises which would support a wider scope of Defendants' alleged fraud and reach into the public, and the present case is the only matter before the Court involving FCI that deals with a Colorado plaintiff and franchise.

As such, for all of these reasons, the Court cannot find that the Amended Complaint adequately sets forth facts that, if proved, could establish a significant public impact of consumers in Colorado, and Defendants' motion to dismiss should be granted as relates to Plaintiffs' CCPA claim.

---

[6]    In comparison, the District of Colorado found public impact in *Bonanno v. The Quizno's Franchise Co. LLC*, No. CIV.A. 06-CV-02358-W, 2008 WL 638367, at *4-5 (D. Colo. Mar. 5, 2008), where the Amended Complaint stated that "Quiznos took the franchise fee from more than 3,000 franchisees and has failed to provide a store to them" and alleged that the conduct will continue to impact consumers who may consider purchasing a Quiznos.

## IV.   RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 25) be **GRANTED** in part and **DENIED** in part as follows:

1.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 25) be **GRANTED** as to Plaintiffs' claim under the Colorado Consumer Protection Act, and that the claim be **DISMISSED WITHOUT PREJUDICE**; and

2.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 25) be **DENIED** as to Plaintiffs' claim under the New York Franchise Sales Act.


DATED:  December 19, 2019                    *s/ Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).